IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 4, 2021

## IN RE AZARIAH R., ET AL.

**Appeal from the Juvenile Court for Cocke County
No. 06069A     Brad Lewis Davidson, Judge**

_____

### No. E2020-01034-COA-R3-PT

_____

This appeal concerns the termination of a mother's parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Cocke County ("the Juvenile Court") seeking to terminate the parental rights of Shauntel C. ("Mother") to her minor children Azariah R. and Ahleigha C. ("Azariah" and "Ahleigha" respectively; "the Children" collectively). After a hearing, the Juvenile Court entered an order terminating Mother's parental rights to the Children. Mother appeals, arguing that the Juvenile Court erred in its best interest determination by failing to account for her improvements over the course of the case. Although we reverse the ground of failure to visit, we affirm the grounds of substantial noncompliance with the permanency plan and failure to manifest an ability and willingness to assume custody. We also affirm the Juvenile Court's best interest determination, finding Mother's improved efforts in some areas to be real but insufficient. We thus affirm, in part, and reverse, in part, resulting in our affirming the termination of Mother's parental rights to the Children.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed, in Part, and Reversed, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

Ryan T. Logue, Morristown, Tennessee, for the appellant, Shauntel C.

Herbert H. Slatery, III, Attorney General and Reporter, and Kristen Kyle-Castelli, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

## OPINION

## Background

Mother gave birth to Azariah in January 2017, and Ahleigha in May 2018.[1] Mother could not financially support the Children or provide a home for them. In August 2018, Mother entered into a temporary custody agreement with Misty D.V. In September 2018, Mother—who has epilepsy and suffers from seizures—accidentally dropped Ahleigha, fracturing her skull. In response to the incident, DCS held a child and family team meeting. In February 2019, Misty D.V. petitioned to resign as the Children's guardian. In March 2019, the Juvenile Court placed the Children into DCS custody. In its order, the Juvenile Court noted that the parents had not completed their non-custodial family permanency plans. Shortly thereafter, DCS filed a petition seeking to have the Children adjudicated dependent and neglected, which Mother stipulated. In April 2019, the Juvenile Court found the Children dependent and neglected.

In March 2019, a permanency plan was developed for Mother. This first plan contained a number of responsibilities for Mother, to wit: (1) attend 4.3 hours of supervised visitation with the Children; (2) contact DCS at least every other week; (3) provide DCS verification of her neurological appointments and that she is taking her prescribed medication as directed; (4) provide a plan for the safety of the Children while in her care, to include having a responsible adult with her and the Children; (5) follow up on her disability application and provide the evidence to DCS; (6) allow background checks for anyone residing in her home or that will be present around the Children; (7) complete parenting classes; (8) provide proof of income; (9) provide verification of safe transportation, including a valid driver's license and insurance for the people transporting the Children; (10) sign a release allowing DCS to receive evaluation and treatment summaries; and (11) pay child support. In April 2019, the plan was ratified by the Juvenile Court as reasonably related to remedying the conditions requiring foster care. In September 2019, a second permanency plan was developed. This plan was quite similar to the first plan but added certain additional responsibilities for Mother: (1) confirm scheduled visitations 24 hours in advance; (2) provide food, drinks, diapers and wipes during visitations; (3) request visitation at least twice a month; (4) apply for housing through local housing authority; and (5) provide verification of a stable residence through a lease or rental agreement. In November 2019, this second permanency plan was ratified by the Juvenile Court as reasonably related to remedying the conditions requiring foster care.

---

[1] The Children have different fathers. DCS sought to terminate the parental rights of these men, but they are not parties to this appeal.

On January 9, 2020, DCS filed a petition in the Juvenile Court seeking to terminate Mother's parental rights to the Children. DCS alleged against Mother the grounds of failure to visit, substantial noncompliance with the permanency plan, persistent conditions, and failure to manifest an ability and willingness to assume custody. DCS's petition was tried on July 28, 2020.

First to testify at trial was Michele Eyler ("Eyler"), a DCS family services worker. Eyler had been the Children's case manager for all of their 16 months in state custody. Eyler testified that from September 9, 2019 through January 8, 2020, Mother visited the Children three times. Eyler supervised one visit on December 18 and Youth Villages supervised the other two. Eyler stated that Mother's behavior during the visit was appropriate, and that Mother began bringing food, diapers, and wipes, as well. Eyler stated the other two visits were similar in nature. During this four month stretch, Mother was entitled to exercise eight total visits with the Children; she made only three. Eyler stated that Mother sometimes would fail to confirm visits in advance, which led to their being canceled. Eyler testified that as of January 9, 2020, the date the petition was filed, Mother had not provided proof that she had taken any steps in accordance with her permanency plan—no verification of neurologist appointments or her medication; no safety plan for the Children; no follow-up regarding her disability application; no child support; no income; and, no proof of parenting classes. Mother was then living with her aunt in a home too small for the Children.

Asked what the biggest step in the permanency plan was for Mother, Eyler stated: "I would say the residence, appropriate housing, followed by a safety plan due to the seizures, needing an adult there at all times. It just wouldn't have been safe for her to have the children without supervision." Since the petition was filed, Mother had shown Eyler proof of certain efforts on the permanency plan. Before then, Mother had provided Eyler with a lease of her current residence. Eyler stated that this was a suitable home, size-wise. However, Eyler still had concerns. Eyler testified: "[Mother] recently had a third baby and we were made aware when a referral came into DCS that there had been a domestic altercation between [Mother] and her boyfriend, Bruce, during the pregnancy, very recently before she gave birth to the baby, that we were not aware of." Eyler stated that she did not know who the new baby's father was, but Mother's boyfriend was not the father. Eyler stated that Mother lived at a residence with her cousin and the two of them were on the lease.

Continuing her testimony, Eyler stated that Mother has no financial means of her own. Mother had applied for disability benefits but had yet to be approved. A disability hearing was pending for Mother that August. Eyler testified that Mother had not maintained meaningful contact with the Children prior to the filing of the petition. Mother relied on her boyfriend for financial support, and Mother was no longer on speaking terms

with the aunt she previously lived with. With respect to visitation, Eyler acknowledged that Mother had improved a lot. Eyler testified: "Initially, the children, [Ahleigha] especially, wasn't very attached to her or bonded to her. Didn't really know who she was. But now [Ahleigha] has started to come around and understood too, that, you know, this is mom and [Azariah] is, I would say bonded with her or at least, you know, recognizes her. She gets very excited about seeing mom." Eyler testified that Mother only sporadically inquired about how the Children were doing. Eyler stated, however, that on her visits Mother provided the Children with a substantial number of gifts like food, snacks, diapers, wipes, and toys. Eyler stated that the Children are currently placed in a Youth Villages home. Asked how they interact with their foster parents, Eyler testified: "Just amazing. Wonderful. They love dad. They call them both daddy. They just love them. They are wonderful with them." This was the Children's first and only placement while in state custody. Eyler testified that she believed it was in the Children's best interest for Mother's parental rights to be terminated so they could be free for adoption.

Michael F. ("Foster Father") testified next. The Children had been in his and his husband Walter's care since March 2019. Asked whether Mother ever inquired outside of visits as to how the Children are doing, Foster Father testified that she did not. Mother made no inquiries as to the Children's school events or doctor's appointments. Mother also had not attended their appointments. Foster Father is a staff accountant for a company; his husband is an emergency medical technician. Foster Father testified extensively to how the Children are thriving in their household. Asked about Mother's interactions with the Children, Foster Father testified:

> I honestly felt like it was not a visit that was driven by a parent, rather it was a visit driven by the toddlers. And, you know, a parent happened to be on the other side of it. I think from an educational perspective, a couple things could have happened. So one, inquiries about how are they in school? What are their milestones right now? … Because Youth Villages has a treatment plan for them. So does TEIS. So does KinderCare.

Foster Father testified that the Children tended not to mention Mother outside of her visits with them.

Last to testify was Mother. Mother asserted that she had improved over the course of the case. Mother stated that she was "putting more effort into it, the things that I've had to do." Mother testified that she had lived at her current residence since November. A half-page rental agreement was entered into evidence showing Mother and her boyfriend Bruce as the renters. The rent was $425 per month. Mother's residence is a two-bedroom, one-bathroom house. Mother stated that she had a room with toys and beds ready for the Children. Mother testified also that she had taken parenting classes. When asked what she

learned from these classes, Mother stated: "That you have to set limits to a point … Like on sharing -- and I don't know how to explain it … Like there's a point in time where kids should be disciplined, but not a certain -- it has to be a certain thing, like a necessary thing." When asked if she learned anything new from these classes, Mother testified "not really." Mother testified plainly: "I want [the Children] back."

Mother stated that she does not work and relies on her family for help. However, Mother testified that she had applied for disability benefits. Mother had not yet provided any records to her attorney for the disability process, but she planned on doing it the next day. Mother stated that she lives in a rural area and cannot drive on account of her epilepsy. Mother testified that she has a cousin who drives her places. Mother stated that her boyfriend and a neighbor also help her with transportation. Mother testified that she takes the medications Keppra and Oxcarbazepine once in the morning and once at night. Mother stated that she sees a physician for her condition, but she could not remember the last time she saw him. Mother stated that she was supposed to have a MRI performed at some point. Mother stated that she took her medications daily and got them refilled as needed. When asked what her plan was if the Children were returned to her, Mother testified: "I have somebody with me at all times" and "I don't know what else much I can do." Regarding her education level, Mother stated that she got to the twelfth grade but did not graduate.

On cross-examination, Mother was asked about a pill count performed in court that day wherein she had an excess of four pills. Mother stated that she had pills in a container at her house, and that "it's a different day that I have to take them." Asked whether she had tried to learn anything about parenting beyond taking parenting classes, Mother answered "no." As to who might help her with the Children, Mother testified that both her neighbor and her grandmother could. However, Mother testified that her grandmother is 66 years old and disabled. Mother stated that the neighbor does not work and takes care of her own two grandchildren. Mother testified that her boyfriend pays her living expenses, and that she also receives food stamps. Mother stated that she has a cell phone paid for by her grandmother. Mother testified to a domestic incident with her boyfriend, but that she had since dropped the charges. Mother stated that her boyfriend had not worked since her new baby was born, although "he's been mowing the neighbor's yard and they've been giving us free rent." Mother stated that she missed visits with the Children because she forgot to confirm them in advance.

Mother was asked a series of questions about the Children. Mother was asked what size clothing the Children wear; she did not know. Mother was asked what their favorite TV shows or toys were; she did not know. Mother was asked who the Children's pediatrician was; she did not know. Mother was asked if the Children were allergic to anything; she did not know. Mother was asked what the Children's favorite foods were; she did not know. When asked if she knew what to do if a child chokes, Mother stated:

"The Heimlich maneuver or whatever it's called." Asked if she had any savings, Mother stated that she did, but it consisted of change in a piggybank.

Foster Father was called in rebuttal. Foster Father identified the Children's clothing sizes. Foster Father also testified to the Children's favorite toys and TV shows. Like Mother, Foster Father could not remember the name of the Children's pediatrician, but he testified that there are three doctors who treat them and he identified the name of their medical practice and where it was located. Foster Father stated that Ahleigha had reactions to bug bites and Azariah had reactions to laundry detergent, but that otherwise the Children were not allergic to anything. Foster Father testified that Mother never asked him or the Children any such questions regarding their lives during her visits.

In August 2020, the Juvenile Court entered its Termination of Parental Rights Order and Final Decree of Partial Guardianship. The Juvenile Court found three grounds were proven against Mother by clear and convincing evidence: failure to visit, substantial noncompliance with the permanency plan, and failure to manifest an ability and willingness to assume custody. DCS did not pursue the ground of persistent conditions at trial, and the Juvenile Court declined to find that ground. The Juvenile Court also found by clear and convincing evidence that termination of Mother's parental rights is in the Children's best interest. The Juvenile Court stated in its detailed order, in pertinent part:

> The facts of this case are very clear. The children were initially removed from Mother after an epileptic episode left the youngest child with a skull fracture. From this point on, Mother was instructed to find someone who could assist her in providing care for the children because it would not be safe for her to do so alone. Initially the children were privately placed in a kinship placement, but after that fell through, the children were placed in DCS custody.

> After approximately fifteen months in foster care, this hearing commenced. Testimony from CM Eyler, Foster Father, and Mother were all pertinent to the visitation sustained between Mother and the children. The Court heard testimony that Mother should have had approximately 30 visits and enjoyed only 11, most of which occurred following the filing of the Termination Petition in January of 2020. There were only three visits during the four-month period proceeding the filing. In addition, the Court heard testimony that the visits were not always particularly satisfying to the children; at one visit in particular, the older child requested that Mother read her more books, but sadly the Mother did not have any more books for the children. The Foster Father also reported that it seemed that the visitations were driven by the children and that Mother did not participate as much as

-6-

he would have liked to see. Lastly, the Court finds particularly troubling that Mother's excuse for missing many of her visits – testimony from CM Eyler and Mother revealed that often she did not confirm visitation and therefore visits were cancelled. While the Court feels that visitation with these two girls should have been of paramount concern to Mother, Mother testified that she simply "forgot" about the rules of her visitations, according to the number, she forgot almost 67% of the time.

Perhaps of larger concern is the fact that, after 15 months, Mother has not adequately addressed the safety concerns that led to the children being placed in DCS custody. When the children were removed from Mother it was out of concern that she could not care for the children on her own due to her medical concerns and epilepsy. Mother reportedly began taking her medication and attending doctor appointments to address these issues; however, when testimony at trial turned to this issue, Mother could not remember the last time that she had gone to the doctor and did not approximate a date. Mother also presented her medications for a pill count. For one of Mother's medications the count revealed that she was [taking] the medication as prescribed. For the other medication, four extra pills were counted in the bottle. When questioned about this, Mother reported that she understood that the count was off and explained that there were some extra pills at home in a dispenser. Of course, there were already extra pills, so this begs the question of exactly how many times has Mother neglected to take her medication and she is even now capable of caring for herself? The Court has to find that the answer to the latter question is no.

***

[Failure to visit]

The Court finds that, at the time of the filing of the Petition, Mother has willfully failed to visit the children. DCS filed its Petition to Terminate Parental Rights on January 9, 2020, making the relevant statutory time period between September 9, 2019, and January 8, 2020. During this time period, the Court finds that the Respondent visited the children three times. The Court further finds that the Respondent has visited only a total of eleven times during the children's time in state's custody.

The Court also considered the nature of the children's visits from the testimony of CM Eyler and Foster Father. Both CM Eyler and Foster Father admitted that the children enjoyed the time when they got to see their Mother,

but also each testified that Mother required a lot of prompting to interact with the children and bring them appropriate snacks and items during the visitation. The Court heard testimony that she did bring some things and that she progressed in that regard, but even as of the last visit, Mother was not bringing books which the children specifically requested so that Mother could read to them. This is despite Mother reporting that she has plenty of books for the children at her home if she were to get the children back in her custody.

The Court finds that the Respondent was in no way incapacitated or prevented from visiting with the children during the four month period. The Court finds that the Respondent knew of her duty to visit because the same was explained to her several times, including in the Dependency and Neglect Petition that was filed on March 7, 2019, and the Criteria and Procedures for Termination of Parental Rights which Mother signed on March 27, 2019.

***

[Substantial noncompliance with the permanency plan]

The Courts finds that DCS created a permanency plan for the children on March 27, 2019, and ratified that plan on April 9, 2019. The plan required Mother to, *inter alia*, find stable housing, create a safe environment for the children by ensuring that she would be supervised with the children at all times, complete parenting classes, and ensure that she is taking her medication as prescribed.

To date, Mother has not substantially complied with the permanency plan. The relevant time period to consider is only what was happening prior to the filing of the Termination Petition. At the time of the Petition being filed, Mother had not completed parenting classes. Mother had provided some details regarding ensuring that she was supervised with the children, but could not provide a concrete plan. She simply stated that a series of people will help and if someone cannot help someone else would. DCS and this Court were expecting a schedule, a calender – something that indicated commitment to helping Mother look after the children. Her testimony was, as of the day of trial, that the plan would be for her boyfriend to help watch after the children, but then testified that he would have to mow the lawn to pay rent and that he was no longer working, which took all income for Mother off the table. Mother then reported that some other family members could help with income. In essence, even as of the day of trial Mother had

-8-

not committed to any sort of plan to ensure the safety of the children if they were placed back in her care.

\*\*\*

[Failure to manifest an ability and willingness to assume custody]

The Court finds that in the time since the children have come into state's custody Mother manifested no ability to parent the children. During the 15 months, Mother has shown no ability to financially support the children. Mother has only recently taken steps to obtain disability, and this Court is well aware of how long that can take. Mother testified that she would rely on several other people to provide her income, including her boyfriend, who she said is not working, a grandmother on a fixed income, and her cousin who is trying to go to school to be something in the dentistry field.

Mother stated that she wants the children; however, her actual steps to manifest an ability do not clearly align with the statement. Mother is not able to provide the Court with a simply [sic] plan for how she is going to maintain supervision while she has the children in her care. This step is one of the simplest on her permanency plan and would have shown to this Court a seriousness in the Mother to obtain custody of the children and maintain them in her care. The truth is, however, that Mother was not able to verbalize a plan for ensuring that she and the children would be supervised. She just would always go find someone when she needed them – unfortunately, that is not a plan. It is hardly even a plan to have a plan. Mother has not manifested an ability to maintain these children in her care at this time.

By the same token as her ability, it cannot be said that the children would be safe if placed back with the Mother. The children were initially removed from her care because she did not have an adequate plan to care for the children during her epileptic episodes, resulting in one of the children receiving a skull fracture, albeit accidentally. Nonetheless, Mother was then required, by medical professionals, to always have another individual with her and the children to prevent further injury to either child. Mother has not shown that there is a coherent plan to ensure that she and the children are supervised. Without supervision as prescribed by the Permanency Plan and medical professionals, this Court can only assume that the children would be at risk of further injury in a placement with Mother.

-9-

***

[Best interest]

The Court finds the following in regards to each of the factors enumerated in §36-1-113(i) by a preponderate of the evidence:

(1) By testimony from Mother and her counsel's own admission, Mother is not ready to have the children returned to her at this time. All of Mother's planning revolves around what other people will hopefully be able to do for her. At one point she was relying on one group of people, now she has an entirely different group of people. Mother has not made changes to provide safely for the children in her home.

(2) Testimony from CM Eyler indicated that she attempted to help Mother and to provide guidance. However, that guidance simply didn't take in a timely fashion. There were some particular concerns that Mother was redirected several times regarding providing for the children and even at one of the last visits was not providing adequate entertainment for the children when one child asked for another book and Mother did not have any, nor did she get more before the next visit.

(3) During the course of this case, Mother could have had up to 32 visits with the children. Mother, however, took advantage of only 11. While Mother stated that she would like to have more visitation, this Court can recognize that she didn't take advantage of the visitation with which she was already provided. It is clear to this Court that Mother should have visited more.

(4) While testimony revealed that the children will call Mother "mother" during visits, the Court finds particularly telling to their relationship with Mother the fact that the children never ask about her when they are not participating in a visit. The children do not request more time with her or make a fuss when the visit is over.

(5) This Court recognizes that the Foster Father and his husband have been excellent for the children. Foster Father testified regarding the children's milestones, their medical history, and their current developmental needs. These were all questions for which Mother had no answer. It is clear that removing the children from these foster parents would set them back developmentally.

(6) Although there was some testimony regarding some domestic violence, that matter was dropped by the district attorney in Hamblen County and the matter has no bearing on this hearing. In addition, the drop that resulted in the children being taken from Mother was related to her medical

-10-

condition and not an assault on the child. That being said, there has been no testimony of any brutality towards the children.

(7) The domestic violence also does not weight into whether there is a safe home environment. Although there is some mystery surrounding the lease and there are now more people in the home with the birth of an additional child, it does not appear that the home is, *per se*, unfit.

(8) There is some concern about Mother's mental and emotional ability to care for the children. Mother submitted to a pill count today and her pill count was over, meaning that she had missed taking medication a few times; however, Mother reported that she had even more medication at home. Mother is not able to care for her own medical needs right now, let alone those of the children.

(9) There was no support paid by the guidelines, but this Court finds that there was a substantial amount given in gifts at the visits that would have amounted to being in substantial compliance with child support guidelines.

**By clear and convincing evidence, the Court finds that the factors enumerated in Tennessee Code Annotated § 36-1-113(i)(i), (ii), (iii), (iv), (v), and (viii), as well as other factors considered by this Court, weigh in favor of termination of parental rights being in the best interest of the child.**

(Bold in original). Mother timely appealed to this Court.

### Discussion

Although not stated exactly as such, Mother raises the following single issue on appeal: whether the Juvenile Court erred in finding that termination of her parental rights is in the Children's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

> A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[2] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley*

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

*v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not.

-12-

*In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[4] Tenn. Code Ann. § 36-1-113(i).

petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n.15 (Tenn. Ct. App. 2007)).

## B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered).  Clear and convincing evidence supporting any single ground will justify a termination order.  *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Mother does not challenge any of the three grounds found against her.  Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted).  Therefore, we will review each of the three grounds found against Mother.  The three grounds at issue are set out in statute as follows:

> (g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:
> (1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;
> (2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4;
>
> ***
>
> (14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child; …

Tenn. Code Ann. § 36-1-113(g) (Supp. 2020).[5]

As pertinent, abandonment is defined as follows:

> (1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:
> (i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to

---

[5] We apply the parental termination statutes as they read on January 9, 2020, when the petition was filed.

-15-

terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

\*\*\*

(C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;

\*\*\*

(E) For purposes of this subdivision (1), "failed to visit" means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period;

\*\*\*

(I) For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure;

Tenn. Code Ann. § 36-1-102 (Supp. 2020).

We first address whether the Juvenile Court erred in finding against Mother the ground of failure to visit. The Juvenile Court found that Mother visited the Children three times in the four months preceding the filing of the petition; Mother was entitled to visit the Children eight times during that period. The Juvenile Court focused a good deal on the quality of the visits rather than their frequency. Of note, the Juvenile Court emphasized Mother's failure to bring certain books on her visits to read to the Children. We find this less compelling than did the Juvenile Court. Mother's failure to bring enough books, or specific books, on visits is not a basis for sustaining this ground against her. The record

-16-

reflects that Mother had three appropriate, if imperfect, visits with the Children during the relevant four month window. She could have had more, but she often forgot to confirm visits in advance as required. Nevertheless, under the specific circumstances of this case, we do not find Mother's visits "token" in nature. This ground is not supported by the requisite clear and convincing evidence. We, therefore, reverse the ground of failure to visit.

We next address whether the Juvenile Court erred in finding against Mother the ground of substantial noncompliance with the permanency plan. Our focus on this ground is on a parent's effort to comply with the permanency plan rather than total achievement of the plan's desired outcomes. *In re B.D.*, No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *8 (Tenn. Ct. App. Mar. 2, 2009), *Rule 11 perm. app. denied May 18, 2009*. In its order, the Juvenile Court stated flatly that the only period of time that may be considered on this ground is the period of time before the petition is filed. While this Court has stated that a parent's refusal to act on her permanency plan until after the filing of a petition to terminate parental rights *can* be 'too little, too late,' *see In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at *6 (Tenn. Ct. App. Apr. 4, 2018), *no appl. perm. appeal filed* (quoting *In re A.W.*, 114 S.W.3d 541, 546-47 (Tenn. Ct. App. 2003), we have not put down an iron bar to consideration of a parent's post-petition efforts to comply with her responsibilities under the permanency plan.

Here, Mother completed parenting class, although she testified she learned nothing new from them. Mother filed for disability benefits and was awaiting her hearing date as of trial. Mother obtained housing, albeit not with her own income. Mother presented a lease on her residence. In a number of instances, Mother made efforts to comply with the permanency plan and did so. However, the Juvenile Court found that "Mother had provided some details regarding ensuring that she was supervised with the children, but could not provide a concrete plan…. DCS and this court were expecting a schedule, a calender – something that indicated commitment to helping Mother look after the children." We agree with the Juvenile Court that Mother failed to put forward a concrete plan of supervision, which was perhaps her most crucial task under the permanency plan given the reasons the Children entered state custody in the first place. "[A] permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives." *In re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at *8 (Tenn. Ct. App. Dec. 30, 2014), *no appl. perm. appeal filed*. Taking into account Mother's efforts to comply with the permanency plan both before and after the filing of the petition, Mother's efforts simply were insufficient, her noncompliance substantial. We find, as did the Juvenile Court, that the ground of substantial noncompliance with the permanency plan was proven by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume custody. With respect to this ground, our Supreme Court has explained that "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, No. M2019-00313-SC-R11-PT, ⸺ S.W.3d ⸺, 2020 WL 7258044, at *14 (Tenn. Dec. 10, 2020) (emphasis in original). Here, the Juvenile Court noted Mother's testimony that she wanted to assume custody of the Children but went on to find that she failed to manifest an ability to do so. The Juvenile Court found that Mother was unable to provide even a simple plan for how she would be able to supervise the Children. The evidence does not preponderate against these findings. Mother lacks any independent income or means of transportation. Instead, Mother testified only that somebody would help her if she needed it. Moreover, Mother's testimony was that she could not remember the last time she saw her doctor, and her pill count was off at trial. Mother has not successfully grappled with her medical condition, let alone put herself in a position to be able to parent the Children. As found by the Juvenile Court, Mother failed to manifest an ability to parent the Children, which satisfies the first prong to this ground.

The second prong of this ground concerns whether placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child. The Juvenile Court found that Mother's lack of a plan for care resulted in one of the Children receiving a fractured skull. The Juvenile Court found further that, since the time of that unfortunate accident, Mother still had not developed a coherent plan of care and supervision. The Juvenile Court found accordingly that the Children would be put at further risk of harm were they to be placed in Mother's custody. The evidence does not preponderate against these findings. We find, as did the Juvenile Court, that the ground of failure to manifest an ability and willingness to assume custody was proven against Mother by clear and convincing evidence.

The final issue we address is whether termination of Mother's parental rights is in the Children's best interest. The factors to be considered by courts in determining whether termination of parental rights is in a child's best interest are set forth in statute as follows:

> (i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:
> (1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

-18-

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;
(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;
(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;
(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;
(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;
(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;
(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or
(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2020).

In her brief, Mother argues that the Juvenile Court failed to consider Mother's strides in housing, parenting classes, and initiating the process to obtain social security. Mother cites to the concurring and dissenting opinion in *In re Gabriella D.*, No. E2016-00139-COA-R3-PT, 2016 WL 6997816 (Tenn. Ct. App. Nov. 30, 2016) (Stafford, P.J., W.S., concurring and dissenting), *rev'd*, 531 S.W.3d 662 (Tenn. 2017) for the proposition that the focus of a best interest analysis is not to punish a parent for her historically bad behavior. *Id*. at *22.[6] However, the factual circumstances presented in that case are quite different from those presented in the present case. Judge Stafford, in concluding that petitioners therein had failed to show that termination of parental rights was in the children's best interest, noted "the children had been living in Mother's home, incident-

---

[6] Mother erroneously states that the concurring and dissenting opinion in *In re Gabriella D.* was authored by Judge L. Marie Williams. Judge Williams was the trial judge in that case; Judge J. Steven Stafford, Presiding Judge W.S., authored the concurring and dissenting opinion on appeal.

free, for nearly two years at the time of trial." *Id*. Our Supreme Court agreed and reversed the Court of Appeals decision, stating:

> Based on the proof in this record, Mother has achieved a rare accomplishment for parental termination proceedings. She has separated herself from a person who was long an abusive and toxic influence in her life. She has cooperated with DCS and completed all the tasks the permanency plan required of her. She has obtained treatment for a longstanding drug addiction and has remained drug free, as drug screens have demonstrated, for years after completing treatment. She has reestablished relationships with her children and built a strong family support system for herself and the children. The children have thrived in Mother's care and wish to remain with Mother. The expert witnesses and DCS witnesses opined that removing the children from Mother would not be in their best interests. The Juvenile Court opined that the children should remain with Mother. Considering the record as a whole, we conclude that the trial court correctly held that the combined weight of the proof does not amount to clear and convincing evidence that termination is in the best interests of the children.

*In re Gabriella D.*, 531 S.W.3d 662, 686 (Tenn. 2017).

The instant case is readily distinguishable from *In re Gabriella D.* Here, the Children have not been living in Mother's care for an extended period of time without incident. Mother has shifted from person to person for aid—her aunt, her cousin, now her boyfriend. Mother still has no real plan for how to supervise the Children. In addition, the DCS witness, Eyler, opined that termination of Mother's parental rights would be in the Children's best interest. Mother's circumstances bear little resemblance to the parent's turnaround in *In re Gabriella D.*

The Juvenile Court made findings with respect to each of the nine statutory best interest factors, and the evidence does not preponderate against these findings. Despite her undeniable efforts in some areas—completing parenting classes, applying for disability benefits, improving her visits, providing gifts to the Children on visits—Mother still is not in a position to safely parent the Children, despite having checked some boxes. Regrettably, that does not appear likely to change any time soon. Indeed, despite taking parenting classes, Mother testified that she learned nothing new from them. At trial, Mother was essentially stumped on most basic questions about the Children. She has shown neither the inclination nor curiosity to inquire into their lives.

With respect to her own circumstances, Mother's testimony regarding her current medical regimen are far from reassuring. She could not remember the last time she saw

her doctor. Her explanation for her discrepant pill count was not credited by the Juvenile Court. As noted by the Juvenile Court, Mother's explanation actually made the discrepant pill count even larger and more of a concern.

Meanwhile, the Children are thriving in their foster home. Foster Father's testimony was impressively detailed and reflected the keen interest the foster family has taken in the Children's development. The Children's best interest would not be served by keeping them in a state of limbo. We find by the standard of clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Children's best interest.

## Conclusion

The judgment of the Juvenile Court is affirmed, in part, and reversed, in part, the result being that we affirm the termination of Shauntel C.'s parental rights to Azariah R. and Ahleigha C. This cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Shauntel C., and her surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE